## 55626. AYCOCK v. THE STATE.

SMITH, Judge.

This case presents one issue: Is the oily substance found in the appellant's possession to be legally classified as Schedule I tetrahydrocannabinol (THC), or as marijuana? Chemically, it has characteristics of both; legally, it must be one or the other. The distinction is more than academic. If this small amount of fluid is classified as marijuana, the appellant is guilty of a misdemeanor; if THC, the appellant is guilty of a felony punishable by up to 15 years in prison. An analysis of the relevant statutory provisions together with the available scientific evidence leads to the conclusion that the substance here must be classified as marijuana. The appellant's conviction for possession of Schedule I THC is therefore reversed.

On a previous appearance of this case, we reversed the appellant's conviction because he had not been permitted to obtain an independent laboratory analysis of the substances found in his possession. *Aycock v. State,* 142 Ga. App. 755 (236 SE2d 863) (1977). We declined at that time to reach the question whether the alleged THC was to be classified as marijuana or as Schedule I THC.

The appellant obtained an independent analysis of the substances, and a second trial followed. At this trial without a jury, the appellant did not contest Count 2 of the indictment, a charge of possession of marijuana. As to Count 1, the charge of possession of Schedule I THC, the appellant contested only the legal classification of the substance he admittedly had unlawfully possessed. Evidence was presented on the classification question only, and following the presentation the trial court entered a verdict of guilty as to both counts. We granted this interlocutory review prior to sentencing.

### I. Statutory Provisions

The operative statute in this case is the Georgia Controlled Substances Act. Code Ch. 79A-8 (Ga. L. 1974, p. 221 et seq.). The relevant sections of that Act are described below.

(a) *Marijuana.* Code § 79-802 (o) defines as marijuana "all parts of the plant Cannabis Sativa L., . . . the resin extracted from any part of such plant, and every

compound, manufacture, salt, derivative, mixture, or preparation of such plant . . ."

(b) *Tetrahydrocannabinol.* Code § 79A-805, which establishes five schedules of controlled substances, generally defines a Schedule I substance as one having a high potential for abuse, no currently accepted medical use, and no accepted safety for use under medical supervision. Code § 79A-805 (b)(1). Thus, Schedule I substances are considered the most dangerous and are the most prohibited of the controlled substances. A listing of Schedule I substances is found in Code § 79A-806; in specific, § 79A-806 (d) lists the following: "Any material, compound, mixture or preparation which contains any quantity of the following hallucinogenic substances . . . (16) Tetrahydrocannabinols."

(c) *Punishment.* Simple possession of up to one ounce of marijuana is a misdemeanor offense punishable by up to a year in prison, $1,000 fine, or both. Code § 79A-9917. Simple possession of any amount of a Schedule I substance is a felony punishable by two to 15 years in prison for a first offense, and five to 30 years in prison for any subsequent offense. Code § 79A-811 (c).

*II. Factual Setting*[1]

What is THC? THC is the component of cannabis which can take full credit for boosting this plant's

---

[1] The scientific material contained herein was derived from the testimony of the two expert witnesses as well as from the following sources: "Biological Effects of Marihuana," Vol. I, Ch. 1, Appendix, Marihuana: A Signal of Misunderstanding (the first report of the National Commission on Marihuana and Drug Abuse) pp. 15 et seq.; and, Hearings before the Subcommittee to Investigate the Administration of the Internal Security Act and Other Internal Security Laws, of the United States Senate Committee on the Judiciary, Part 2, May 8, 1975. (See particularly the testimony of Dr. Coy W. Waller, Director of the Research Institute of Pharmaceutical Sciences at the University of Mississippi, and Dr. Carlton E. Turner, Director of the federally sponsored Marihuana Project of the School of Pharmacy, University of Mississippi. Much of the scientific knowledge about

popularity well beyond the popularity of any other weed known to our culture. Kudzu, crabgrass, and poison ivy are the banes of suburbia; add a little THC and they would become instant cult heroes. THC is the psychopharmacologically active component of the cannabis plant. Most THC exists in the form of an isomer known as delta-9-THC, but somewhat less than ten percent of naturally occurring THC is of the delta-8 isomer. Both delta-8-THC and delta-9-THC produce a psychological effect. They are found in all cannabis plants, and they are not known to exist elsewhere in nature. Concentrations of THC can be produced in two ways, either by chemically extracting it from the cannabis plant or by synthesizing it in the laboratory. A simple procedure, using organic solvents to remove the THC from cannabis, can produce an oily substance variously known as "hash oil," "marijuana oil," or "liquid marijuana." Terry Mills, senior forensic chemist and supervisor of the drug identification division of the state crime laboratory, offered his opinion that the THC thus extracted "is not marijuana; it is tetrahydrocannabinol. It is the extract, the pure compound from the drug." The defense presented Dr. James Woodford, an organic chemist, who described the common procedure for obtaining hash oil. The basic process, he said, removes not only THC, but many other chemicals, from the cannabis plant. These other chemicals include a group known as cannabinols, and they, like THC, occur naturally only in the cannabis plant. Further refinement of the hash oil could remove the cannabinols and reduce the extract to more nearly pure delta-9-THC, but the refinement process is complex and difficult and is not likely to be employed for other than scientific research. The hash oil becomes a valuable and marketable street drug without this refinement. While the basic extraction process does not remove the cannabinols from the end product, it does remove plant fibers. Mr. Mills testified that because of this absence of

marijuana is attributable to the work of the Marijuana Project, and samples from many drug seizures, especially those made by the Drug Enforcement Administration, are sent there for analysis.)

plant fibers, the substance would show no "gross morphological features" of the cannabis plant. For this reason alone, and despite the fact that the substance may contain cannabinols unique to the cannabis plant, the crime lab's policy is to classify these extracted substances as Schedule I THC rather than as marijuana.

The hash oil extraction procedure is contrasted to the procedure for obtaining hashish from the cannabis plant. Hashish is a resin which is oozed out of the flowery part of the plant, collected, and pressed into bricks. Hashish generally contains a higher concentration of THC than that found in the cannabis plant as a whole. The crime lab classifies hashish as marijuana rather than Schedule I THC because hashish retains plant fibers, i.e., the "gross morphological features" of the cannabis plant.

THC is found in different concentrations in different substances, and we can arrange these substances on a hypothetical continuum of increasing THC concentration. At the very bottom of the scale, we find the basic cannabis plant. More specifically, THC concentrations increase in the following order of the various parts of the plant: seed, roots, large stems, small stems, leaves, flowers, and bracts. Most marijuana samples seized in the United States have averaged around one or two percent THC content. Some Mexican and South American varieties of cannabis have been found to have from four to seven percent THC, and the bracts from these potent plants may contain as high as 10 percent THC.

Hashish tends to have higher concentrations of THC, and thus it would generally rank higher on the scale than cannabis. Hashish samples which have been seized and tested generally range from two to seven percent THC, though it is believed that hashish derived from very potent plants could assay as high as 14 percent THC. Hashish, then, would range higher on the concentration scale, but it would overlap with some parts of the cannabis plant. Because hashish still retains some of the visible structure and form of the cannabis plant, the crime lab classifies it as marijuana.

Hash oil achieves a much higher range on the scale. Tested samples of this substance ranged from five to

almost 90 percent THC; the majority of samples range from about 20 percent to 50 percent. Nestled at the very top of the scale would be pure or nearly pure THC. This compound may be derived by refining hash oil to remove the other organic compounds, or it may be synthesized from certain petroleum based chemicals.

The legal question presented here is this: Where along the above scale does a substance cease to be marijuana and begin to be Schedule I THC? The state crime lab has reached its own determination of the demarcation between marijuana and THC. Unfortunately, the Controlled Substances Act provides no such guidelines, and our task here is to fashion a rule consonant with the language and intent of the Act and with due regard for the rules pertaining to construction of criminal statutes. Before departing on our own analysis, we will review in some detail the analyses employed in this case by the crime lab and by the trial court.

As indicated above, the crime lab's approach narrows the focus to one factor, the presence of certain plant fibers. If a sample contains "plant material exhibiting gross morphological features characteristic of Cannabis Sativa L.," then the sample will be tested for and treated as marijuana. Conversely, if a sample contains no gross morphological features of cannabis, it will be tested for THC. If those tests are positive, the sample will be classified as a Schedule I substance. The dividing line for the crime lab, then, is that point at which the substance ceases to contain plant material exhibiting the form and structure of the cannabis plant. The substance may contain indications that it is of botanical origin (for example, it may contain chlorophyll, a chemical almost exclusively produced by plants) and it may even contain indications that it is of cannabis origin (for example, it may contain cannabinols) but unless it retains some of the physical structure and form of the cannabis plant, the crime lab will not classify it as marijuana.

In this case, the oily substance contained no morphological features of the cannabis plant. The crime lab therefore tested the substance for THC, and the tests were positive for delta-9-THC. Dr. Woodford testified that, in his opinion, the sample contained chlorophyll, an

indication that it very likely was derived from cannabis. And Mr. Mills even conceded that the substance "probably" came from cannabis. But because of the lack of any morphological features of cannabis, the substance was classified by the crime lab as Schedule I THC.

At trial, the appellant contended that hash oil, necessarily derived from cannabis, should be classified as marijuana, and synthetically produced THC should be the only substance legally classified as Schedule I THC. The trial court noted that the state had *not* proved beyond a reasonable doubt that the substance was industrially synthesized THC rather than botanically derived hash oil, but the court discounted the importance of the distinction: "However, if Ga. Code Section 79A-806 (d) (16) is to be given any application at all it must be applied to all tetrahydrocannabinols, whether they be of synthetic or natural origin, provided that the substance in evidence shows a greater concentration of tetrahydrocannabinol than could be mechanically extracted from any physical part of the Marijuana plant in its natural state." The trial court thus fashioned a "relative concentration" test for pinpointing the dividing line on our continuum: If the THC concentration in the sample could be acquired mechanically (such as by oozing out the resin to form hashish), the substance is still marijuana; if the concentration is so great that it could not be acquired mechanically, but only chemically (such as by dissolving the THC from the parts of the plant), the substance is classified as Schedule I THC.

### III. Analysis

Because of the language of the statute involved, and because of the applicable rules of statutory construction, we find both the "gross morphology" test and the "relative concentration" test to be unworkable and contrary to the meaning of the statute.

(a) *The statutory conflict.* There is a clear overlap between Code §§ 79A-802 (o) and 79A-806(d)(16), both set forth in Part I, ante. On one hand, "all parts" of the cannabis plant, including "every compound . . . derivative . . . or preparation of such plant," are classified as marijuana. Code § 79A-802 (o). Unmistakably, a cannabis extract such as hash oil falls within this definition. It is

precisely a compound, derivative, and preparation of the Cannabis Sativa L. plant. On the other hand, Schedule I THC is defined as "any material" containing "any quantity" of "tetrahydrocannabinols." Code § 79A-806 (d)(16). This definition is broad enough to include not only industrially synthesized THC and concentrated THC extracted from cannabis, but also hashish and everyday street grade marijuana, for they all contain "any quantity" of THC. (In fact, Mr. Mills testified that several police departments had once sought to have seized marijuana cigarettes classified as Schedule I THC.)

Since the Controlled Substances Act does not further refine the marijuana/THC distinction, a literal reading of the entire Act, including its penalty provisions, leads to the situation where a single act may be punishable in two ways by the same statute. For example, the individual carrying less than one ounce of hashish in his pocket is possessing marijuana as Code § 79A-802(o) defines it, and he is therefore punishable for a misdemeanor under Code § 79A-9917; equally, he is possessing THC as Code § 79A-806(d)(16) defines it, and he can be imprisoned up to 15 years for this offense. Code § 79A-811(c). This same analysis applies to all cannabis-derived substances falling anywhere along our hypothetical continuum. They are all marijuana, and they are all THC.

Since the statute defines two punishments for possessing any of these substances, which of the two punishments should be imposed? " 'Where there are two sections in a statute providing a punishment or penalty for the same act or offense, one providing a greater and the other providing a lesser, the section prescribing the greater is abrogated by the one prescribing the lesser. Where any uncertainty develops as to which penal clause is applicable, the accused is entitled to have the lesser of two penalties administered.' " *Curtis v. State,* 102 Ga. App. 790, 802 (118 SE2d 264) (1960). The above language was quoted approvingly by the Supreme Court in *Gee v. State,* 225 Ga. 669, 676 (171 SE2d 291) (1969), a case involving reconciliation of divergent penalty provisions in the Georgia Drug Abuse Control Act (Ga. L. 1967, pp. 296, 343 et seq.), the predecessor to our current Controlled Substances Act. This specific rule for penalty provisions is

based upon the general rule that "[p]enal statutes are always construed strictly against the State and liberally in favor of human liberty." *Curtis v. State,* supra. See also *Glustrom v. State,* 206 Ga. 734, 738 (58 SE2d 534) (1950); *Riley v. Garrett,* 219 Ga. 345 (133 SE2d 367) (1963).

We conclude, therefore, that any substance which is a resin, compound, manufacture, salt, derivative, mixture, or preparation of the cannabis plant shall be treated as marijuana, even though the substance may contain a high percentage of THC. For the state to sustain a charge of possession or distribution of Schedule I THC, the state must prove that the THC is not a compound, derivative, or preparation of the cannabis plant; that is, the state must prove that the THC is synthetically derived. This same result was reached in People v. Campbell, 72 Mich. App. 411 (249 NW2d 870) (1976), where the Michigan Court of Appeals held that possession of "natural" THC would be punishable as a marijuana offense whereas possession of synthetic THC would be punishable as a Schedule I offense: "Unless the statute [Michigan Controlled Substances Act, M. C. L. A. § 335.301 et seq.] is so interpreted, any person selling marijuana could be charged with sale of THC and become subject to the greater penalty since all marijuana contains at least a trace of natural THC. In enacting the Controlled Substances Act, the Legislature did not intend such an anomalous result."

(b) *The ineffectiveness of tests which distinguish between different grades of cannabis produced THC.* The most obvious bar to the crime lab's "gross morphology" test and the trial court's "relative concentration" test is that these tests are simply unauthorized by Code § 79A-802(o). That section does *not* define marijuana as all parts of the cannabis plant, including every compound, derivative, preparation, etc., of such plant, "so long as such compound, derivative, preparation, etc., retains the gross morphological features of the cannabis plant." Nor does the section define as marijuana all parts of the cannabis plant, including every compound, derivative, preparation, etc., "so long as such compound, derivative, preparation, etc., does not contain a higher proportion of THC than that which could be mechanically extracted

from the cannabis plant." There are no such exceptions to the scope of the legal definition of marijuana, and neither the crime lab, nor the trial court, nor this court, is authorized to create such exceptions.

Even if such exceptions were necessary in order to support the intent of the legislation, the exceptions proposed by the crime lab and by the trial court do not appear to provide an adequate basis for distinction. First, the gross morphology test singles out only one of the unique properties of cannabis, its structure and form; take away this property, and the crime lab ceases to treat the substance as marijuana. In doing so, the crime lab ignores the fact that the substance may still contain up to 20 different cannabinols, all of which are unique to cannabis, and all of which can be chemically detected. Thus, a substance may be literally teeming with evidence that it is a cannabis compound or derivative, but the crime lab will not classify it as marijuana *because it no longer looks like cannabis*. Such a result could not conceivably match the language of Code § 79A-802 (o).

Second, the test which looks to the relative concentration of THC in the substance does not single out all hash oil; rather, it singles out only that which happens to be more potent than, say, a good grade of hashish. This may indeed be a logical way to approach the problem, for there undoubtedly may be a stronger interest in proscribing the more potent solutions. But under the test, a poorly prepared hash oil sample would be classified as marijuana, and a somewhat purer sample would become Schedule I THC. Such subtle distinctions, with such enormous consequences, must be left to the legislature.

### IV. Conclusion

We are not comfortable with where this has led us. THC can be synthesized, but most THC concentrations on the street are the hash oil variety. And there may be some difficulty in proving that a particular sample is not derived from cannabis.

Although an anomalous result — as the Michigan court phrased it — would be reached if an individual carrying a small amount of marijuana could be charged instead with felonious possession of Schedule I THC, our decision here does not rule out other anomalous results.

For example, Dr. Turner, testifying before the Senate Subcommittee (Hearings, p. 453 (note 1, supra)), stated that he had used a very simple chemical procedure to prepare hash oil from marijuana. The THC concentration in his end product was increased by a factor greater than 16, and the weight was reduced by a factor greater than 10. Thus, a man possessing one half pound of marijuana would be committing a felony. Using Dr. Turner's process, he could retain all the THC in his possession while reducing the total weight of the substance to less than an ounce. Without sacrificing any of the psychological potential of the substance in his possession, he has reduced his crime to a misdemeanor. And his misdemeanor will be easier to conceal. (Results such as this are inherent in the one ounce threshold of Code § 79A-9917, which looks to the weight of the gross product rather than to the weight of the active compound within the gross product. For example, several pounds of cannabis seeds or stalks may well contain less THC than an ounce or less of moderately potent cannabis leaves, but possession of the seeds or stalks would be a felony and possession of the leaves would be a misdemeanor.)

The law enforcement aspect of this situation presents perhaps the strongest imperative for treating hash oil differently from ordinary marijuana. At the subcommittee hearings, Jerry Jenson, deputy administrator of the Drug Enforcement Administration, testified, "It is no surprise to DEA that these more concentrated forms are appearing on the market. In 1971, a research study . . . predicted that as marihuana usage became more prevalent in the United States, the users would seek stronger and stronger forms; also, as the enforcement effort became more efficient, the smugglers would reduce the size of the contraband by condensing it to make it easier to bring in, smuggle in, in large quantities. Law enforcement was prepared for this as evidenced by our escalating removals." Hearings, p. 436 (note 1, supra). And Senator James O. Eastland, chairman of the subcommittee, termed hash oil "one of the most frightening drugs on the market today." He added, "At the average potency of 45 to 50% THC, an ounce of it is enough to intoxicate over 1000 people. It is, moreover, very easy to prepare; and it is attractive to the traffickers,

additionally, because it is so easily concealed and because they can get so high a return for it." Hearings, p. vi. (note 1, supra).

Thus, we can clearly see why it would be a salutary legislative choice to exclude a preparation such as hash oil from the definition of marijuana and treat it instead as the unusual and dangerous drug it is. But this court cannot alter the clear language of Code § 79A-802(o) to exclude from the definition of marijuana any compounds containing very high proportions of THC. Only the legislature can do that.

Because the state failed to prove that the alleged THC was synthetic and not cannabis derived, the judgment of conviction as to Count 1 is reversed. The judgment as to Count 2, possession of marijuana, is affirmed.

*Judgment affirmed in part and reversed in part. Bell, C. J., Quillian, P. J., Webb, Shulman and Birdsong, JJ., concur. Deen, P. J., and McMurray, J., dissent. Banke, J., disqualified.*

ARGUED APRIL 3, 1978 — DECIDED JULY 3, 1978 —

*Al Horn, Charles S. Thornton,* for appellant.

*Robert E. Keller, District Attorney, Harold G. Benefield, Assistant District Attorney,* for appellee.

DEEN, Presiding Judge, dissenting.

I respectfully dissent. Paper is extracted from or is a derivative from pulpwood. Bread toasted loses its identity and becomes toast. Hydrogen plus oxygen plus a tea bag equals tea. To ask the question, "Does the latter possess *any quantity* of oxygen," is not a pertinent question, as the components have lost their identity and are now known exclusively as tea. The same applies to paper and toast.

Hash oil with all plant fibers removed shows no "gross morphological features" of the cannabis plant and is classified as THC. Hashish retains plant fibers and is therefore classified as marijuana. The latter retains some of the visible structure and form of the cannabis plant. The content of cannabinols in marijuana and Schedule I

THC is immaterial. The line of demarcation between the two is the presence or absence of plant fibers. THC may be of botanical origin containing chlorophyll or industrially synthesized; either way, it is THC, not marijuana.

This question is one of technology and science best left to experts under the circumstances of each case. I would affirm.

I am authorized to state that Judge McMurray joins in this dissent.